IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

THE KANAWHA-GAULEY COAL & COKE COMPANY,

        Plaintiff,

v.                                 CIVIL ACTION NO.  2:09-cv-01278

PITTSTON MINERALS GROUP, INC.,

        Defendant.

MEMORANDUM OPINION AND ORDER

On March 25, 2011, the parties each submitted proposed findings of fact and conclusions of law to the court.  On March 28, 2011, the court conducted a bench trial in this action. The parties submitted supplemental briefing on April 12, 2011.  Having considered the pleadings, the testimony of witnesses, the documents in evidence, and the supplemental post-trial memoranda, the court makes its Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

I.      FINDINGS OF FACT

The following discussion represents the court's findings of fact as to liability.  Each finding is made by a preponderance of the evidence.

A.      Kanawha-Gauley's Lease with Kanawha-Development Corporation

This case arises out of a breach of a lease of coal property and related surface rights.  The plaintiff, Kanawha-Gauley Coal & Coke Company ("Kanawha-Gauley") entered into an "Amended,

Consolidated, and Restated Lease" ("the Lease") with Kanawha Development Corporation ("KDC"). Under the Lease, which had an effective date of January 1, 1998, Kanawha-Gauley agreed to lease property to KDC for mining purposes in exchange for receiving wheelage and royalty payments. KDC had additional obligations under the Lease including paying required taxes on coal and real estate, complying with applicable laws and regulations, and maintaining certain insurance policies.

In light of the extensive rights and obligations described in the Lease, I have limited my findings of fact to the provisions that are relevant to the instant dispute. Articles III and X of the Lease set out KDC's royalty payment obligations. Article IV sets out KDC's tax payment obligations. Article XII details Kanawha-Gauley's rights to enforce provisions of the Lease.

Article III of the Lease, entitled "Covenants of the Lessee" first described KDC's obligation to comply with appropriate federal, state, and local regulations. (Pl.'s Ex. 1, at 8-9.) Article III also set out the rates and terms of KDC's obligation to pay Kanawha-Gauley production (or tonnage) royalties on each ton of coal that KDC "mined and delivered to the loading point" or "used and consumed on the Leased premises by the Lessee." (Id.) The court thus **FINDS** that royalties did not accrue until the coal was used or delivered to the loading point. Article III set out the formula for calculating the rate of the production royalty based, among other things, on the monthly average gross selling price of the coal. (Id. at 8-11.) Pursuant to the Lease, production royalties were to be calculated on a monthly basis, with the royalty payments for any given month due to Kanawha-Gauley on or before the 25th calendar day of the following month. (Id. at 10.) The lessor (KDC) was responsible for weighing and measuring the volume of coal produced, however Kanawha-Gauley "maintained the right to test the accuracy of the method used." (Id.) With respect to late payments, the Lease provided that "[a]ny payment not promptly made by Lessee to the Lessor shall

bear interest from the date due at two percentage (2%) per annum above the prevailing interest rate then charged by Bank One, West Virginia, N.A., of Charleston, West Virginia or its succesor." (Id. at 13-14.)  Article III also set a minimum yearly production royalty of $120,000 per year.  (Id. at 12.)

Article X of the Lease described KDC's obligation to pay "wheelage" royalties in exchange for the right to transport coal "into, out of, over, through and under the Leased Premises." (Id. at 25.) Similar to Article III, Article X set out the formula for calculating the monthly wheelage royalties, based in part on the origin and the selling price of the "foreign" coal.  (Id. at 26-28.)  As with the production royalties, the wheelage royalties were due to Kanawha-Gauley on or before the 25th of the following month.  (Id. at 29.)  Article X did not contain a separate yearly minimum for the wheelage royalties and, instead, provided that the "rights and privileges under this Article X are granted in consideration of the payment of $120,000.00 minimum royalty payment as required under Article III, taxes as set forth in Article IV, indemnity and insurance as set forth in Article XVII, and wheelage royalties on foreign coal." (Id. at 26.)

Article IV described the taxes that KDC was obligated to pay under the Lease.  Article IV provided, in pertinent part, as follows**:**

> Lessee covenants that, commencing with the 1998 ad valorem real estate taxes which attached as a lien on July 1, 1997, Lessee shall promptly pay when and as the same become due and payable, all valid taxes, levies and assessments on Leased Premises . . . and the coal on, in and under said Leased Premises. . . .

(Id. at 14.)  The section also required KDC to pay taxes on "improvements and property" on the Leased Premises as well as "the leasehold estate hereby created." (Id.)

Finally, Article XII of the Lease described Kanawha-Gauley's rights and remedies against a landlord to collect rents, demand that KDC comply with the terms of the Lease, and, ultimately,

to terminate the Lease.  Under Article XII, Kanahwa-Gauley, as lessor, could terminate the Lease "[i]n the event Lessee shall fail to pay any rent, royalty, or other charge herein provided for or hereby required when and as the same becomes due, . . . and after twenty (20) days have elapsed from demand for the payment thereof has been made in writing by the Lessor." (Id. at 31).  The Lease also provided that Kanahwa-Gauley could terminate the Lease for breaches of other provisions, including subletting or assigning the Lease without Kanawha-Gauley's permission or failing to comply with "the applicable laws relating to mining operations."  (Id.)

### B.     The Surety Agreement Between Kanawha-Gauley and Pittston

The Lease also contained an agreement ("the Agreement") between Kanawha-Gauley and the defendant, Pittston Minerals Group ("Pittston"), which is the basis for this lawsuit. The Agreement appears on page 43 of the Lease (Pl.'s Ex. 1, at 46), immediately proceeding page 44, which bears the notarized acknowledgment of signatures of representatives from all three companies: Kanawha-Gauley, KDC, and Pittston. (Id. at 47.)  Under the Agreement, Pittston agreed to the following:

> (i) to be jointly bound with Kanawha Development Corporation in the performance of the Lessee's covenants set forth herein to the same extent as if it had been a joint lessee; (ii) to hold Lessor harmless from any cost, charge, expense, or loss due to default under this Lease by Kanawha Development Corporation; (iii) that it consents in advance to any modification of this lease and that its liability shall be deemed modified in accordance with any such modification; (iv) that this guaranty applies to renewals, extensions, and holdover terms of this Lease; (v) that this guaranty shall remain in effect notwithstanding an assignment of this Lease or subletting of the Leased Premises by the Lessee; (vi) that the undersigned waives its rights to trial by jury with respect to this guaranty or any matters arising hereunder; (vii) that any and all agreements, modifications and supplements hereafter entered into between Lessor and Lessee respecting said lease and/or Leased Premises shall not relieve, change, or discharge the obligations of the undersigned hereunder nor shall the consent of the undersigned be required to make any such agreement, modification or supplements effective.

-4-

(Pl's Ex. 1, at 46.)  KDC was a fully owned subsidiary of Pittston when Kanawha-Gauley entered into the Lease with KDC and the Agreement with Pittston.

The court **FINDS** that Kanawha-Gauley and KDC amended the Lease four times[1] between 1998 and 2009.  (Pl.'s Ex. 1, at 54-75.)   These amendments largely pertain to specific parcels of property constituting the "Leased Premises," however some of these amendments also modified the royalties and late payment fees due under the Lease.  Each of these amendments was signed by Christian Bozorth on behalf of Kanawha-Gauley and an officer, either the president or vice president, of Kanawha-Gauley.[2]  (Id., at 56-57, 60, 63-64, 74-75.)  The court **FINDS** that Pittston is not mentioned in these amendments, no Pittston representative signed any of the amendments, and there is no evidence in the record to suggest that Pittston ever received any notice of the amendments.  Of particular relevance to this case is the fourth and final amendment to the Lease, which, among other things, imposed additional late payment charges of up to $500 a month in addition to the interest that Kanawha-Gauley charged for late payments.  (Id. at 71-72.)  The fourth amendment was not signed until March 3, 2009, however, it stated that it was effective as of December 31, 2007.  (Id. at 65, 75.)

## C.    The Sale of KDC

On November 14, 2003, Pittston sold all of its stock in KDC to Appalachian Coal Holdings ("Appalachian Coal"), Incorporated.  The court **FINDS and CONCLUDES** that Pittston no longer had any ownership interest in KDC, however, Pittston's obligations under the agreement remained

---

[1] The first document amending the Lease is titled as a "supplemental agreement," however, this document actually is the first amendment to the Lease.  (Pl.'s Ex. 1, at 54-56.)

[2] It appears that KDC's management changed over the course of the eleven year period of time, and, accordingly, three individuals, Bernie Mason, John C. Smith, Jr., and G. O. Young, II, signed various amendments, each in his capacity as president or vice president of KDC.  (Pl.'s Ex. 1, at 56-57, 60, 63-64, 74-75.)

in effect.  According to Christian Bozorth, president of Kanawha-Gauley, Pittston requested that it

be "released as guarantor" when it entered into the stock sale agreement with Appalachian Coal.

(Trial Tr. p. 29.)  Mr. Bozorth stated that Kanawha-Gauley "decided not to release Pittston as

guarantor," based on the financial information that Kanawha-Gauley received from Appalachian

Coal.  (Id.)  Kanawha-Gauley, after a disagreement with Appalachian Coal, began accepting the

monthly royalty and wheelage payments due under its Lease with KDC on checks from Appalachian

Coal.[3]

> **D.      KDC's Breaches Under the Lease**

By all accounts, KDC satisfactorily performed its obligations under the Lease for several

years until at least 2004.  During trial, counsel for the plaintiff stated that there was a "material

breach" under the Lease in 2004 (Trial Tr. p. 4); however no explanation or evidence as to this

breach was presented at trial and it appears that it was resolved because Kanawha-Gauley and KDC

continued to perform under the Lease into 2009.  During trial, counsel for the defendant also

referenced a 2008 dispute between Kanawha-Gauley and KDC, (Trial Tr. 11), which resulted in

arbitration and a June 6, 2008 settlement between Kanawha-Gauley, KDC, Appalachian Coal, and

Pittston (Def.'s Ex. 17).  The court **FINDS** that neither the 2004 breach nor the 2008 settlement bear

on the instant dispute other than to explain the relationship between the players in this lawsuit.

---

[3] Kanawha-Gauley's accountant initially refused to accept checks from Appalachian Coal, on the grounds that royalty checks "must be issued by Kanawha Development Corporation, who is lessee," and that if a royalty check "is not received from Kanawha Development Corporation, we [Kanawha-Gauley's accounting firm] are to receive a letter concerning payment by other parties." (Pl.'s Ex. 3.)  On August 16, 2004, Appalachian Coal notified Kanawha-Gauley that "all correspondences, payments, reports, and etc.," sent by any of the Appalachian Coal companies are sent "on behalf of Kanawha Development Corporation."  (Pl.'s Ex. 4.)  Thereafter, Kanawha-Gauley's accounting firm accepted payment made by the checks drawn on Appalachian Coal checks. (Trial Tr. 34-36.)

The instant dispute began in 2008 and ultimately resulted in KDC defaulting on the Lease and Kanawha-Gauley terminating the Lease in 2009.  The court **FINDS** that mining operations ceased in mid-April of 2008, however, coal was still being sold, meaning that KDC continued to owe royalties.  (Trial Tr. p. 86.)  During the time that KDC was in default on the Lease, mining equipment and "coal stockpiles" were left on the leased premises.  The parties dispute both the ownership and the value of this property, however, for reasons discussed below, *see* Section III.A.3.b, *infra*, the court need not address these disputes.

The court **FINDS** that the first breach concerned unpaid real estate taxes on the leased property.  On September 29, 2008, Kanawha-Gauley's attorney sent KDC a letter via certified mail informing KDC that it had failed to pay the ad valorem real estate taxes on the property as required by the Lease.  (Def.'s Ex. 5.)  Included with this letter were 5 delinquency notices from the Sheriff of Fayette County, West Virginia, stating that because the taxes had not been paid on the 5 plots of property tax liens had been placed on the property.  (Id.)  The letter does not mention Pittston and there is no evidence that Pittston received a copy of the letter or any other notice of KDC's failure to pay the required taxes.

The court **FINDS** that the next breach involved unpaid royalties.  On December 25, 2008, KDC failed to pay royalties for the production month of November.  Appalachian Coal ultimately paid the November royalties on behalf of KDC by check for $224,737.58 dated February 27, 2009.  (Pl.'s Ex. 8, at 26.)  This check, which did not include payments for any interest or late fees, was received by Kanawha-Gauley on March 2, 2009.  (Id. at 25.)

The court **FINDS** that on January 25, 2009, KDC failed to make any royalty payment for the production month of December.  The royalty payment owed for the production month of December

was $771,274.84.[4]  (Id. at 23.)  On February 25, 2009, KDC again failed to make any monthly

royalty payment for the preceding month.  The payment owed for January was $179,922.01.  (Id. at

17.)  As previously discussed, Appalachian Coal made a partial payment on KDC's debt and paid

the outstanding $224,737.58 for the November production royalties.  Kanawha-Gauley accepted this

payment on March 2, 2009.  Thus, the court **FINDS** that as of March 2, 2009, Kanawha-Gauley was

still owed royalties for December and January, totaling $951,968.85, as well as interest and fees on

the late payments.

The court **FINDS** that in early March 2009, counsel for Kanawha-Gauley and Appalachian

Coal met and developed a payment plan for the debts owed under the Lease.  (Trial Tr. p. 38-39.)

Pursuant to this plan, on March 25, 2009, Appalachian Coal sent a letter to Kanawha-Gauley

enclosing a check for partial payment of $200,000 towards the "production royalty owed to

Kanawha-Gauley for the production month of December."  (Pl.'s Ex. 6.)  The letter confirmed a

"verbal agreement" between counsel for Kanawha-Gauley and Appalachian Coal.  (Id.)  The court

**FINDS** that as of March 25, 2009, payment for the production month of February was due under the

Lease, and this sum totaled $91,840.54.  (Pl.'s Ex. 6.)  Thus, as of March 26, 2009, when Kanawha-

Gauley received this second partial payment, the court **FINDS** that Kanawha-Gauley was still owed

royalty payments of $571,274.84 for the production month of December, $179,922.01 for the

production month of January, and $91,840.54 for the production month of February, and these past

due royalty payments totaled $843,037.39.  (Id.)  The court **FINDS** that Kanawha-Gauley was also

owed interest and late payment fees on this outstanding debt.  Pursuant to the payment plan, as

---

[4] This figure refers solely to the royalty payments owed under the Lease; it does not include
interest or late payment charges that were later imposed by Kanawha-Gauley.

confirmed by Appalachian Coal's March 25, 2009 letter, "the balance of $571,274.84 plus January and February production royalties [for a total of $843,037.39] and any interest due would be paid by April 30." (Id.)

The court **FINDS** that Kanawha-Gauley did not receive any further payments towards these outstanding debts. No evidence was introduced at trial as to further discussions of or payments made on these outstanding debts. In addition, the court **FINDS** that although coal continued to be sold from the leased premises, Kanawha-Gauley did not receive royalty payments for the production months of March, April, May, or June of 2009. The court **FINDS** that these payments were owed in the amounts of $113,680.78 for the production month of March, $71,052.00 for the production month of April, $19,182.18 for the production month of May, and $242.07 for the production month of June.[5]

### E.      KDC's Default and Termination of the Lease

The court **FINDS** that on May 22, 2009, Kanawha-Gauley mailed a notice of default pursuant to Article XII of the Lease to both KDC and Pittston. (Pl.s' Ex. 9.) The notice made a demand for "all past due rent, royalty, and other charges due from you to the Lessor," and provided that "pursuant to ARTICLE XII of the above-referenced instrument, if said sums are not paid and twenty (20) days have elapsed from the date of the receipt of this letter, that the Lessor may terminate said lease." (Id.) Specifically, the notice demanded the following payments:

1.      Production royalties for the production months of December 2008, January 2009, February 2009, and March 2009, totaling $889,391.77;

2.      Wheelage royalties for the production months of December 2008, January 2009, February 2009, and March 2009, totaling $67,326.40;

---

[5] This figure accounts only for royalties incurred prior to the June 19, 2009 termination date.

3.      Interest on the past due royalty payments, totaling $10,157.32 as of May 1,
        2009;
4.      Interest on the late payment for the production month of November and the
        late (partial) payment for the month of December, totaling $3,892.31; and
5.      Late payment penalty charges "as of the 25th day of the month for the months
        of January 2008, through December 2008 and the months of January 2009
        through April 25, 2009, totaling $8,000."

(Id.)  The notice provided that the total for all of the past due amounts was $978,676.80 as of May

1, 2009, and that for each day after May 1, 2009, interest on the past due royalty amounts would

continue to accrue.  (Id.)  Finally, the letter stated that "if all such past due sums are not paid by the

25th day of May, 2009, there is an additional $200.00 late payment penalty charge for each payment

due in the month of May," and reiterated that late payment penalties would continue to accrue at a

cap of $500 per month, pursuant to the fourth amendment to the Lease.  (Id.)  The letter made no

mention of unpaid or delinquent taxes.

        The court **FINDS** that Pittston received this notice on May 27, 2009.  (Id.)  According to

David Fields, president of Pittston, Pittston contacted Kanawha-Gauley, either directly, or by

copying them on a letter to KDC.  (Trial Tr. p. 108.)  On June 9, 2009, Pittston's attorney contacted

Appalachian Coal, notifying them of KDC's default under its Lease with Kanawha-Gauley and

requesting that Appalachian Coal indemnify Pittston "with respect to the claims asserted by

Kanawha-Gauley Coal and Coke Company" pursuant to the terms of the 2003 stock purchase

agreement between Pittston and Appalachian Coal.  (Pl.'s Ex. 18.)  The court **FINDS** that aside from

these communications, Pittston did not take any other action within the twenty-day period to cure

KDC's defaults under the Lease or to contact Kanawha-Gauley regarding KDC's defaults or the

pending termination.  (Trial Tr. p. 110-11.)

The court **FINDS** that on June 10, 2009, Kanawha-Gauley mailed a second notice of default to KDC and Pittston, and this notice pertained to KDC's failure to pay the required taxes and maintain certain insurance coverages under the Lease.  (Def.'s Ex. 10.)  The notice specifically demanded that payment be made for "the taxes for the calendar year 2008, that attached as a lien on July 1, 2007, the first half was due by September 1, 2008, and the second half by February 1, 2009." (Id.)  As with the earlier notice, the letter reiterated Kanawha-Gauley's right to terminate the Lease if the tax defaults were not cured within twenty days of receipt of the notice.

The court **FINDS** that on June 19, 2009, Kanawha-Gauley terminated the Lease.  The court further **FINDS** that as of that date, Kanawha-Gauley was owed $1,027,770.17 in unpaid production and wheelage royalties for the production months of December 2008 through April 2009, exclusive of interest and late payment fees, which continued to accrue on an ongoing basis.  (Pl.'s Ex. 8.)  As of June 19, 2009, royalty payments for the production months of May and (part of ) June were not technically "past due," as payments for these months were not due until June 25 and July 25, respectively.  Nevertheless, the court **FINDS and CONCLUDES** that Kanawha-Gauley is owed production royalties[6] on the coal "mined and delivered to the loading point" or "used and consumed on the Leased premises" up until the termination of the Lease on June 19, 2009.  The past due payments were in the amount of $19,182.18 for the production month of May and $242.07 for the production month of June, for a total of $19,424.25.  (Id.)  The court **FINDS** that, as of the time Kanawha-Gauley filed the instant suit, the past due payments totaled $1,047,194.42.  The court further **FINDS** that as of June 19, 2009, the 2008 taxes required under the Lease remained unpaid, although these unpaid taxes were not technically a "debt" owed directly to Kanawha-Gauley.  On

_____

[6] No wheelage royalties were incurred during the production months of May or June of 2009.

-11-

July 30, 2009, Kanawha-Gauley paid the delinquent taxes for the 2008 tax year, and Kanawha-Gauley now seeks reimbursement for these tax payments.[7]

### F.    Bankruptcy and Related Proceedings Involving Appalachian Coal

During the time period of KDC's breaches and default, Appalachian Coal encountered financial difficulties that ultimately resulted in the creditors of Appalachian Fuels, LLC, which was an operating subsidiary of Appalachian Coal, filing an involuntary Chapter 7 bankruptcy petition against Appalachian Fuels, LLC in the United States Bankruptcy Court for the Eastern District of Kentucky on June 26, 2009. *In re Appalachian Fuels, LLC*, No. 09-bk-10343 (Bankr. E.D. Ky. 2009). Although I believe that these issues are, at best, of limited relevance to the instant action, I will address them briefly here because the defendant has repeatedly relied on them.

The court **FINDS** that on May 29, 2009, prior to the filing of the Chapter 7 petition, the creditors of the Appalachian Holding Company, Inc., and its subsidiaries (collectively "Appalachian"), including the subsidiary Appalachian Coal, were contacted by letter from counsel. (Def.'s Ex. 9.) The letter stated that on May 26, 2009, Appalachian executed "Deeds for the Assignment for the Benefit of Creditors conveying all property of the Assignors (the "Property") to the undersigned." (Id.) The undersigned was an assignee-trustee appointed by the District Court of Fayette County, Kentucky to "liquidate the Property in order to maximize the value of the Property for the benefit of the creditors of the Assignors in accordance with the priorities and procedures established by law." (Id.) As part of this assignment, KDC, which was fully owned by Appalachian

---

[7] On October 15, 2009, Kanawha-Gauley made an additional tax payment in the amount of $80,792.39 for taxes for the first half of 2009. For reasons discussed in the damages section, *see* Section IV.B, *infra*, the court concludes that this payment is not recoverable.

Coal, which, in turn, was a subsidiary of Appalachian, assigned "all of its property" to the trustee. (Def.'s Ex. 7.)

On July 29, 2009, Kanawha-Gauley filed an adversary complaint for declaratory relief against KDC and the above-named trustee in the United States Bankruptcy Court for the Eastern District of Kentucky. *Kanawha-Gauley Coal & Coke Co. v. Kanawha Dev. Corp.*, No. 09-ap-01013 (Bankr. E.D. Ky. 2009). Kanawha-Gauley sought declaratory relief that the Lease was terminated before the June 26, 2009 bankruptcy petition was filed, and, accordingly, that the Lease was not a part of the bankruptcy estate. On September 29, 2009, the bankruptcy court, by agreed judgment of the parties, ruled that the Lease was not property of KDC's estate. Agreed Judgment, *Kanahwa-Gauley Coal & Coke Co. v. Kanawha Dev. Corp.*, No. 09-ap-01013 (Bankr. E.D. Ky. Sept. 29, 2009).

### G.    Post-Termination Communications

The court **FINDS** that on July 1, 2009, counsel for Pittston sent Kanawha-Gauley a letter, stating Pittston's position that Kanawha-Gauley's June 19, 2009 termination of the Lease also terminated Pittston's guaranty agreement. (Def.'s Ex. 12.) There is no evidence in the record that Kanawha-Gauley ever responded to this letter.

The court **FINDS** that on September 22, 2009, Pittston sent Kanawha-Gauley another letter, which reiterated Pittston's position that "it is discharged from any obligation under the Guaranty Agreement." (Def.'s Ex. 13.) In short, Pittston accused Kanawha-Gauley of inappropriately dealing with KDC and pursuing a new lease with another party, all of which increased Pittston's risk of liability. According to Pittston, Kanawha-Gauley's June 19, 2009 termination of the Lease with KDC was ineffectual because Kanawha-Gauley failed to provide the Fayette County assignee-trustee with its June 19, 2009 termination notice. (Id.) Pittston stated that for "this and other reasons efforts

-13-

to terminate the lease were ineffectual." (Id.) Pittston argues that, Kanawha-Gauley had not actually terminated the Lease as of the June 26, 2009 bankruptcy filing.  Thus, under Pittston's theory, the Lease was part of the bankruptcy estate, contrary to any assertions or agreements made by Kanawha-Gauley or KDC in the bankruptcy proceedings.  As previously discussed, the bankruptcy court entered an order to the contrary, declaring that the Lease "terminated and is not property of KDC's estate."  Agreed Judgment [Docket 8], *Kanawha-Gauley Coal & Coke Co. v. Kanawha Dev. Corp.*, No. 09-ap-01013 (Bankr. E.D. Ky. Sept. 29, 2009).

According to Pittston,"it is clear that the Lease, if left in the bankruptcy estate, would have been assigned and pre-petition defaults, if any, cured without any liability to Pittston."  As discussed above, Kanawha-Gauley and KDC entered into an agreement, subsequently entered by the bankruptcy court, that the Lease was *not* part of the bankruptcy estate.  Pittston, however, challenges the validity of this agreement because it constituted "inappropriate dealings" between Kanawha-Gauley and KDC and "increased the risk of loss to the guarantor, in this case Pittston." (Id.)  Pittston claimed that "but for the KDC and [Kanawha-Gauley] agreement not to contest the termination of the Lease [the defaults] would likely have been cured in the Bankruptcy Proceeding." (Id.)  Pittston essentially argued that Kanawha-Gauley had an obligation to allow the Lease to be included in the bankruptcy estate where, Pittston argued, it would have been cured, thus relieving Pittston of liability.  Finally, the letter "advised that Pittson considers the actions of [Kanawha-Gauley] in pursing the Massey Transaction to constitute a breach of its duty to Pittston" and requested that Kanawha-Gauley "preserve all documents related to the Massey transaction." (Id.)

**H.    The Instant Action**

-14-

On September 25, 2009, Kanawha-Gauley filed the instant action against Pittston in the Circuit Court of Fayette County, West Virginia. The plaintiff's Complaint asserts claims for breach of contract and estoppel and the plaintiff claimed damages for unpaid royalties, unpaid wheelage, unpaid real estate taxes, missing coal, lost coal, and unperformed reclamation obligations as well as legal costs and fees. On November 24, 2009, the defendant removed the action to this court pursuant to 28 U.S.C. § 1332 based on complete diversity of citizenship between the parties.

On November 3, 2010, the parties filed cross-motions for summary judgment, which, after briefing and oral argument on the issues, this court denied in a Memorandum Opinion and Order dated January 28, 2011 [Docket 81]. On March 29, 2011, the court conducted a bench trial in this action. The court requested supplemental briefing on two issues: (1) the notice obligations owed to a joint obligor or surety; and (2) the scope and nature of a party's duty to mitigate damages. The parties submitted these briefs on April 12, 2011.

During trial, the plaintiff called two witnesses: Christian Bozorth and David Fields. The defendant called one witness, Scott Dyer. The court has made findings as to the credibility of each of these witnesses below. The parties also introduced numerous exhibits, which the court has relied on extensively in makings its findings today. To the extent that the parties raised questions or objections to the admissibility of evidence, the court has noted and resolved the objections.

The defendant also sought to introduce additional testimony as to the value of equipment and coal stockpiled on the leased premises by way of exhibits and testimony. (Trial Tr. 123-26). Rather than admit this additional evidence into the record over the plaintiff's objections, the court accepted

-15-

the defendant's proffer as to the exhibits and testimony.  (Trial Tr. 126-41.)[8]  Following trial, the defendant filed these exhibits with the court, requesting that the court "take notice" that they were offered and refused at trial.  (Notice of Filing [Docket 123].)  As I will discuss below, this additional proffered evidence is solely relevant, if at all, to damages and Pittston's attempts to limit the same. The proffered evidence does not bear on the issue of Pittston's liability.  The court has considered Pittston's proffered evidence in light of the entirety of the record, and ultimately concludes that this proffered evidence is not necessary or appropriate for consideration in deciding the issues before the court.

## II.      FINDINGS CONCERNING EVIDENCE AND WITNESS CREDIBILITY

The relevant facts in this case are largely undisputed.  Perhaps because of that, a substantial majority of the relevant evidence in this case was presented to the court in the form of exhibits containing, among other things, legal documents (including the Lease and amendments), correspondence between the parties and players, and royalty statements.  The testimony of the three witnesses served largely to offer background on the relationships between the parties, to place the exhibits in context, and to lay a foundation for the admission of the exhibits into evidence. Accordingly, in reaching its findings of fact, the court has largely relied on the admitted exhibits rather than the testimony of the witnesses.  Nevertheless, the court will briefly summarize its general findings as to the credibility of the three witnesses.

### A.      Christian Bozorth

---

[8] Because these materials are not relevant to my decision here, I need not address the plaintiff's evidentiary objections to the same under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as well as Rule 26 of the Federal Rules of Civil Procedure.

Mr. Bozorth testified as to the history and nature of the relationship between Kanawha-Gauley, KDC, Pittston, and Appalachian.  To the extent that Mr. Bozorth's testimony was corroborated by evidence in the record, the court credits his testimony and has relied on it to place the plaintiff's exhibits in context.  When questioned on direct examination, Mr. Bozorth appeared forthright and generally knowledgeable.  The court does note that Mr. Bozorth appeared less credible on cross examination when questioned about certain events and decisions that occurred in the spring of 2009.  Specifically, the court notes that Mr. Bozorth was evasive when asked about his decisions regarding notice to Pittston of KDC's breaches under the Lease.  (Trial Tr. p. 73-77.)  Ultimately, this testimony was not dispositive because Pittston failed to establish that Kanawha-Gauley was required to provide Pittston with this additional notice.

### B.     David Fields

The plaintiff also called David Fields, the current president of Pittston Coal Management Company, which is the company that manages the defendant Pittston.  Mr. Fields testified briefly as to the correspondence between Kanawha-Gauley and Pittston regarding KDC's breaches under the Lease and the actions that Pittston took regarding these breaches.  The court credits Mr. Fields' testimony as it relates to these events and has relied on it both for background and to place exhibits in context.  Mr. Fields appeared sincere, forthright, and candid and his testimony was not contradicted anywhere in the record.

### C.     Scott Dyer

The defendant called Scott Dyer, a former employee in the accounting department of Appalachian Coal.  Mr. Dyer testified about procedures for mining, shipping, measuring, and selling the coal from the leased property.  Mr. Dyer also testified as to the procedures for making royalty

payments on the coal to Kanawha-Gauley.  Mr. Dyer appeared  knowledgeable and forthright and the court credits Mr. Dyer's testimony, although it was ultimately irrelevant to the disputed issues.

## III.  CONCLUSIONS OF LAW

### A.  COUNT ONE - BREACH OF CONTRACT

#### 1.  Elements of a Breach of Contract Claim

In order to establish a claim for breach of contract under West Virginia law, a plaintiff must prove the following elements by a preponderance of the evidence: (1) the existence of a valid, enforceable contract; (2) that the plaintiff has performed under the contract; (3) that the defendant has breached or violated its duties or obligations under the contract; and (4) that the plaintiff has been injured as a result.  *See Exec. Risk, Inc. v. Charleston Area Med. Ctr. Inc.,* 681 F. Supp. 2d 694, 714 (S.D. W. Va. 2009).

With respect to the fourth element, "[r]ecoverable damages in an action for breach of contract cannot be too remote, contingent or speculative, but must consist of actual facts from which a reasonably accurate conclusion could be drawn regarding the cause and amount of such damages." *Exec. Risk Inc.*, 681 F. Supp. 2d at 726.  Thus, a plaintiff must establish not only the amount of its damages but also that the damages were proximately caused by the defendant's breach.  Courts in West Virginia also consider the application of several additional doctrines in calculating the appropriate damages for a breach of contract claim and these doctrines are discussed below.  *See* Section III.A.3, *infra*.

The relationship between parties to a contract is governed not only by the agreement itself, but also by "extra-contractual" duties imposed on the parties by operation of statutes and the common law.  Specifically, "West Virginia recognizes the rule that 'in every contract there exists

-18-

an implied covenant of good faith and fair dealing.'" *Knapp v. Am. Gen. Fin. Inc.,* 111 F. Supp. 2d 758, 767 (S.D. W. Va. 2000) (quoting *Harless v. First. Nat'l Bank in Fairmont*, 246 S.E.2d 270, 274 (W. Va. 1978). This duty does not exist in a vacuum and "[q]uestions of good-faith performance thus necessarily are related to the application of the terms of the contractual agreement." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 217 n. 11 (1985). Moreover, a claim that a party to a contract breached this duty is not a stand-alone cause of action under West Virginia law. *Highmark West Virginia v. Jamie*, 655 S.E.2d 509, 514 (W. Va. 2007) ("[A]n implied covenant of good faith and fair dealing does not provide a cause of action apart from a breach of contract claim.").

The court hereby **CONCLUDES** that the plaintiff has established, by a preponderance of the evidence, all of the elements of a breach of contract claim. First, there is no dispute as to the existence of a valid and binding agreement between the parties. Second, the plaintiff acted in good faith in performing its obligations under the contract.[9] The suretyship[10] contract between Kanawha-

---

[9] My analysis here is confined to the second element of a breach of contract claim. I will address Pittston's arguments as to the duty of good faith under suretyship law in the following section. *See* Section III.A.2, *infra.*

[10] Throughout the course of this litigation, the parties have used the terms "guarantor" and "surety" interchangeably. Although a surety and a guarantor "are both bound for another person," "there are points of difference between them which should be carefully noted." (Black's Law Dictionary (9th ed. 2009) (quoting 1 George W. Brandt, the Law of Suretyship and Guaranty § 2, at 9 (3d ed. 1905)). The distinction is as follows:

> A surety is usually bound with his principal by the same instrument, executed at the same time and on the same consideration. [. . .] On the other hand, the contract of the guarantor is his own separate undertaking, in which the principal does not join. It is usually entered into before or after that of the principal, and is often founded on a separate consideration from that supporting the contract of the principal.

*Id.* Based on this definition, it appears that Pittston was a *surety* rather than a *guarantor.* Pittston was an original promisor, as evidenced by the agreements between the parties. The Agreement between Kanawha-Gauley and Pittston was included as part of the Amended, Consolidated Lease

(continued...)

Gauley and Pittston was straightforward; in exchange for Pittston's promise to be liable as a surety, Kanawha-Gauley agreed to enter into the Lease with KDC. Accordingly, the plaintiff adequately performed under the contract by entering into the Lease with KDC and fulfilling its obligations under that Lease. Third, Pittston has failed to fulfill its obligations under the Agreement. Pittston has not made any payments to Kanawha-Gauley or taken any other action "to hold [Kanawha-Gauley] harmless from any cost, charge, expense, or loss" due to KDC's default as required by the Agreement. Fourth, Kanawha-Gauley has suffered injury as a result of Pittston's breach of the Agreement.

### 2.        The Law of Suretyship and Guaranty

In addition to the general principles of contract law discussed above, the relationship between contracting parties may also be subject to additional rules and duties depending on the specific nature of the contract and the relationship. The agreement at issue in this case was a suretyship agreement, wherein Pittston agreed to be "jointly bound with Kanawha Development Corporation in the performance of the Lessee's [KDC's] covenants set forth herein to the same extent as if it had been a joint lessee" and to "hold Lessor [Kanawha-Gauley] harmless from any cost, charge, expense or loss due to default under this Lease by Kanawha Development Corporation." (Pl.'s Ex. 1, at 46.) Thus, the contract and the relationship between the parties is also governed by common-law principles of suretyship. *See* Restatement (Third) of Suretyship & Guaranty § 17 (1996) ("The duties of the secondary obligor to the obligee, and of the obligee to the secondary obligor, are those existing

---

[10](...continued)
document. (Pl.'s Ex. 1.) Because I have carefully considered the defenses that Pittston raises as either a surety or a guarantor, I need not delve further into the distinctions between the two concepts.

pursuant to the contract creating the secondary obligation, subject to the secondary obligor's defenses arising out of suretyship status.").

Under West Virginia law, a creditor "is bound to observe good faith with the surety." *Leonard v. Jackson Cnty. Court,* 25 W. Va. 45 (W. Va. 1884). A creditor "must withhold nothing, conceal nothing, release nothing which may possibly benefit the surety." *Id*. "If a creditor does any act injurious to the surety, or inconsistent with his rights, or if he omits to do any act, when required by the surety, which his duty enjoins him to do, and the omission proves injurious to the surety, in all such cases the latter will be discharged, and he may set up such contract as a defense to any suit brought against him, if not at law, at all events in equity." *Id.*

A secondary obligor may rely on two categories of defenses—those available to the principal obligor (such as common-law contract defenses) and those "suretyship defenses" that arise by operation of the surety's status as a secondary obligor. *See* Restatement (Third) of Suretyship & Guaranty § 19 (1996). The "suretyship defenses" generally apply when the obligee has taken some action that hinders the interest of the secondary obligor, often to the benefit of the primary obligor. *See* Id. §§ 31-49. Such defenses apply when, for example, the primary obligor has already tendered performance to the obligee (in whole or in part) or when an obligee impairs or releases collateral that served as security for the underling obligation between the obligee and the primary obligor. (Id.)

Pittston relies on the heightened duty of good faith as an affirmative defense and asserts that Kanawha-Gauley breached this duty by failing to provide Pittston with timely notice of KDC's breaches under the Lease.[11] The court **CONCLUDES** that Kanawha-Gauley's notice to Pittston was

---

[11] Pittston raises its "landlord's lien" defense in relation to both the duty of good faith owed to a surety and a plaintiff's duty to mitigate his damages. This court has already held that "Kanawha-
(continued...)

-21-

adequate under both the terms of the agreement (*see* Pl.'s Ex. 1, at 31-33, 41), and the duty of good faith that is owed to a surety. The Agreement between Kanawha-Gauley and Pittston does not contain any language suggesting that Kanawha-Gauley was required to notify Pittston of KDC's performance under the Lease. Under West Virginia law, the duty of good faith requires that an obligor "withhold nothing, conceal nothing, release nothing which may possibly benefit the surety." *Leonard*, 25 W. Va. 45. This duty, however, does not require an obligor to provide additional notice to a surety or otherwise allow a surety to unilaterally rewrite the suretyship agreement and impose additional terms on the obligor.[12] Kanawha-Gauley gave Pittston notice of KDC's default and allowed both KDC and Pittston over twenty days to cure the default.[13] There is no evidence in the record that Pittston contacted Kanawha-Gauley or took any other steps to remedy KDC's defaults

---

[11](...continued)
Gauley did not have a duty to enforce its lien [assuming the existence of a landlord's lien] against KDC before proceeding against Pittston, who unconditionally guaranteed KDC's performance under the lease." (Mem. Op & Ord. [Docket 92], at 6.) I hereby **CONCLUDE** that the duty of good faith implicit in a suretyship agreement similarly did not require Kanawha-Gauley to take steps to enforce any landlord's lien or to collect from KDC before pursuing contractual remedies against Pittston. I will, however, also consider the "landlord's lien" defense in the context of the duty to mitigate. *See* Section III.A.3.b, *infra*.

[12] The court reiterates that Pittston's reliance on suretyship cases involving debtors, creditors, and secured transactions are distinguishable from the present case, which involves a suretyship agreement ancillary to a lease rather than a secured loan. (Mem. Op & Ord. [Docket 92], at 4-6.) None of the agreements in this case involved collateral of any kind, and Pittston's suggestion that Kanawha-Gauley could have "locked the gate" and taken possession of property left on the leased premises does not alter the fact that this was not a transaction secured by collateral.

[13] As the defendant points out, there was a prior dispute between Kanahwa-Gauley, KDC, Appalachain Coal, and Pittston which resulted in a June 6, 2008 settlement. (Def.'s Ex. 17). Accordingly, the court has doubts as to the veracity of Pittston's claims that it did not know about KDC's breaches. At the very least, the prior settlement may suggest that Pittston was on notice about KDC's previously inadequate performance under the Lease.

during that time.  Pittston has failed to carry its burden and establish, as a matter of law, that Kanawha-Gauley was required to provide Pittston with additional notice of KDC's breach.

During trial, Pittston also asserted that, under the same duty of good faith owed to a surety, Kanawha-Gauley was obligated to allow KDC to assign the Lease and allow the assignee to cure the defaults.  Pittston argued that the Lease should have been assigned as part of the bankruptcy proceeding in Kentucky and that such an assignment would have cured KDC's defaults and relieved Pittston of liability.  First, as a factual matter, Kanawha-Gauley terminated the Lease on June 19, 2009, before the July 29, 2009 filing of the involuntary bankruptcy petition, meaning the Lease was not part of the bankruptcy estate.  On September 29, 2009, the Bankruptcy Judge signed an order to that effect, confirming that the Lease was not part of the bankruptcy estate.[14]  Nevertheless, Pittston continues to maintain that Kanawha-Gauley was required to allow the Lease to be included in the estate, without offering any legal authority for this novel argument—that a landlord is *required* by law to allow a lease to be assigned and cured in bankruptcy, rather than terminating the Lease, after a tenant has repeatedly breached the terms of a lease.  Finally, Pittston has failed to offer any evidence that  KDC's defaults under the Lease actually would have been cured in bankruptcy and relieved Pittston of liability.

In summary, the court **CONCLUDES** that Kanawha-Gauley has established that Pittston breached the suretyship agreement.  The court further **CONCLUDES** that Kanawha-Gauley did not breach the duty of good faith and fair dealing that it owed to Pittston as its surety on the Lease. Pittston has posited a variety of hypotheticals—actions that Kanawha-Gauley *could* have taken,

---

[14] The fact that Kanawha-Gauley, KDC, and other parties submitted a proposed order to the court does not change the legal effect of an Order entered by the Bankruptcy Court.

starting with KDC's first relevant breach in September; however, Pittston has failed to establish that Kanawha-Gauley had any *legal obligation* to choose any of these hypothetical actions instead of terminating the Lease.

### 3.   Damages Doctrines for Breach of Contract Claims

Having concluded that the defendant breached the contract, I now turn to the doctrines that West Virginia courts apply in considering whether to limit a plaintiff's damages in a breach of contract action.  These doctrines operate as affirmative defenses and may serve to limit a plaintiff's recovery.  Accordingly, I will consider whether any of these doctrines apply before I proceed to calculate the plaintiff's actual damages in the final section of this Opinion.

### a.   A Plaintiff is Only Entitled to the Benefit of its Bargain

First, West Virginia applies the "fundamental principle of the law of contracts that a plaintiff is only entitled to such damages as would put him in the same position as if the contract had been performed."  *Milner Hotels, Inc. v. Norfolk W. Ry. Co.*, 822 F. Supp. 341, 344 (S.D. W. Va. 1993).  This rule reflects the reasoning that "[c]ontract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed."  Restatement (Second) of Contracts § 347 (cmt. a) (1981).  Thus, Kanawha-Gauley's damages for its breach of contract claim are limited to those that Kanawha-Gauley would have received if Pittston had actually performed its contract and held Kanawha-Gauley harmless from KDC's breaches of the Lease.

In accordance with this damages doctrine, Pittston argues that "[i]f the court were to allow Kanawha-Gauley to recover against Pittston Minerals in this case, Kanawha-Gauley would be in a

-24-

better position than it would have been had the lease been performed," because "Kanawha Gauley would have damages under the Lease *and* the value of the new lease." (Def.'s Prop. Findings ¶ 35.) The court hereby **CONCLUDES** that this argument is without merit. KDC breached its Lease with Kanawha-Gauley by failing to make payments required under the Lease. These payments were due at various points in 2008 and 2009, and when these payments were not made, Kanawha-Gauley ultimately terminated the Lease. With the exception of attorney's fees and interest, all of the damages that Kanawha-Gauley seeks in this case are for debts that KDC incurred prior to the termination of the Lease. The fact that Kanawha-Gauley subsequently entered into a new lease agreement is simply not relevant to the instant case because Kanawha-Gauley is not seeking damages for any debts (aside from interest) that KDC incurred after the termination of its Lease with Kanawha-Gauley.[15] Accordingly, Kanawha-Gauley will not get more than the benefit of its bargain by recovering these payments as expectation damages. (Trial Tr. p. 10.)

**b.      A Plaintiff has a Duty to Mitigate its Damages**

Second, West Virginia recognizes the general rule that a party injured by the breach of a contract has a duty to mitigate its damages. *Cont'l Realty Corp. v. Andrew J. Crevolin Co.*, 380 F. Supp. 246, 255 (D. W. Va. 1974). "Mitigation of damages is an affirmative defense, and its burden is entirely on the contract breaker." *Martin v. Bd. of Ed. Of Lincoln Cnty.*, 199 S.E. 887, 889 (W.

---

[15] Kanawha-Gauley's new lease agreement is not relevant to the instant case because Kanawha-Gauley is not seeking to recover any post-breach damages (aside from interest and attorney's fees). I note, however, that this new lease perhaps undercuts Pittston's mitigation argument. If Kanawha-Gauley had *not* entered into a new lease and had, instead, continued to allow its tenant (KDC) to breach the lease and subsequently sought to recover damages from either KDC or Pittston, (perhaps in the form of the minimum monthly royalty required under the Lease) it is likely that Pittston would have accused Kanawha-Gauley of failing to mitigate its damages. As it happens, Kanawha-Gauley entered into a new lease, which prevented it from incurring additional damages at the hands of a defaulting tenant.

Va. 1938).  This duty, also termed the doctrine of avoidable consequences, "imposes upon a party injured by another's breach of contract or tort the active duty of using all ordinary care and making all reasonable exertions to render the injury as light as possible." *Griffith v. Blackwater Boom & Lumber Co.,* 48 S.E.442, 450 (W. Va. 1904).  Williston on Contracts notes that, while "it has been said that a plaintiff is ordinarily under a duty to mitigate damages,this is not strictly true, since there are no damages for breach of the duty; rather, the plaintiff simply cannot recover those damages that it could have avoided." 24 Williston on Contracts § 64:27 (4th ed. 2011)  The Restatement (Second) of Contracts summarizes the duty as follows:

> Once a party has reason to know that performance by the other party will not be forthcoming, he is ordinarily expected to stop his own performance to avoid further expenditure.  Furthermore, he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.

Restatement (Second) of Contracts § 350 (cmt. b) (1981).  The duty to mitigate damages "presupposes an ability to mitigate." *Cont'l Realty Corp*, 380 F. Supp. at 255  Accordingly, the duty is not triggered until there is a material breach of the underlying agreement because, until a breach occurs, a plaintiff has no damages to mitigate.  *See S. Nat. Bank of Houston v. Tri Fin. Corp*., 317 F. Supp. 1173, 1185 (D. Tex. 1970).

The "duty" to mitigate is of a limited scope in that "an injured party is responsible for doing only those things which can be accomplished at a reasonable expense and by reasonable efforts." *Middle-West Concrete Forming & Equip. Co. v. Gen. Ins. Co.,* 267 S.E.2d 742, 747 (W. Va. 1980). The Restatement provides that "damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation," however, this rule does not preclude an injured party's recovery "to the extent that he has made reasonable but unsuccessful efforts to avoid

-26-

loss." Restatement (Second) of Contracts § 350 (1981). "Moreover, a plaintiff is not under a duty to mitigate damages if the other party, who had the duty to perform under the contract, had equal opportunity to perform and equal knowledge of the consequences of nonperformance." *Smithson v. U.S. Fidelity & Guar. Co.*, 411 S.E.2d 850, 860 (W. Va. 1991). Thus, the duty to mitigate is properly characterized as a limitation on damages and simply prevents a plaintiff from recovering damages that it could reasonably have prevented without incurring additional cost, risk, or burden.

Pittston asserts that Kanawha-Gauley failed, in several respects, to mitigate its damages and that this is an affirmative defense, relieving Pittston of all liability for its breach of the suretyship agreement. First, Pittston contends that Kanawha-Gauley failed to mitigate when it failed to enforce its landlord's lien against property that KDC left on the leased premises. Second, Pittston asserts that Kanahwa-Gauley "could have mitigated its damages by allowing the Lease to be assigned and cured," however, Kanawha-Gauley "terminated the lease and made a new lease with the Massey subsidiary." (Def.'s Prop. Findings ¶ 33.)

The court hereby **CONCLUDES** that Kanawha-Gauley fulfilled its duty to mitigate its damages by making reasonable efforts to avoid incurring additional losses. First, Kanawha-Gauley contacted KDC regarding breaches of the Lease and the evidence in the record suggests that KDC at least made initial efforts to pay Kanawha-Gauley the past due payments. There is evidence in the record which suggests that Kanawha-Gauley, KDC, and the other players had negotiated settlements of KDC's prior breaches under the Lease on at least one other occasion. Pursuant to the fourth amendment to the Lease, Kanawha-Gauley also imposed additional late payment penalties on KDC, which added additional protection for Kanawha-Gauley should KDC continue to make late payments. Finally, when Kanawha-Gauley determined that KDC had sufficiently breached the

-27-

Lease, Kanawha-Gauley provided both KDC and Pittston with the required notice and proceeded to terminate the Lease.  Kanawha-Gauley then entered into a new lease agreement.  Thus, Kanawha-Gauley avoided incurring additional losses that it would have incurred by keeping KDC as a defaulting tenant.

For the purposes of Pittston's landlord's lien argument, I will assume for the sake of argument that Kanawha-Gauley had a valid and enforceable landlord's lien over some tangible property (equipment and coal) on the leased premises at the time of KDC's breaches.  I will further assume that Kanawha-Gauley *could* have enforced this lien by taking some affirmative action and, further, that enforcing this lien would have allowed Kanawha-Gauley to recoup some, if not all, of the debts incurred by KDC under the Lease.[16]  Taking all of this as true, even in light of my prior holding on this defense at summary judgment [Docket 81], I nevertheless **CONCLUDE** that Kanawha-Gauley did not, under the duty to mitigate, have a legal duty to enforce any such lien.  As discussed above, the duty to mitigate requires only that an injured party take reasonable steps to avoid further losses, and Kanawha-Gauley did precisely that by working on a payment plan with its tenant, KDC, and, ultimately terminating the Lease rather than allowing KDC to incur additional debts under the Lease.  The duty to mitigate did not require Kanawha-Gauley to institute a separate, and likely costly, legal proceeding against its tenant to enforce this landlord's lien.

In sum, I **CONCLUDE** that Pittston has failed to establish that either the doctrine limiting damages to the "benefit of the bargain" or the injured party's duty to mitigate its damages limits the

_____

[16] Because of these assumptions, I need not address the unresolved factual issues that would otherwise be necessary for Pittston to prevail on this defense.  Namely, the ownership and value of the property subject to the lease.  Accordingly, the defendant's expert witness whose proffered testimony went to the value of these items and thus the value of the lien, is not relevant to my decision.

-28-

plaintiff's recovery. Kanawha-Gauley fulfilled its duty to mitigate its damages and further that Kanawha-Gauley will not be unjustly enriched or doubly recover for damages that KDC incurred prior to the termination of the Lease. It is hereby **ORDERED** that judgment be entered in favor of the plaintiff on Count One, the breach of contract claim. The amount of damages to be awarded on this claim are discussed below.

### B.       COUNT TWO - ESTOPPEL

In addition to its breach of contract claim, Kanawha-Gauley also asserts, in an independent count, that "[i]n the alternative to the relief requested in Count One, Pittston should be estopped from disclaiming its obligations under the Lease and the Pittston agreement, and should be bound by those obligations." (Compl. ¶ 25.) It is well-settled under West Virginia law that "there can only be one recovery of damages for one wrong or injury." *Kessel v. Leavitt*, 511 S.E.2d 720, 768 (W. Va. 1998) (internal quotation marks omitted). "A plaintiff may not recover damages twice for the same injury simply because he has two legal theories." *Id.* As discussed above, this court has already found for Kanawha-Gauley on Count One, the breach of contract claim, and Count Two seeks the same recovery under an alternative legal theory. Accordingly, the court need not address the alternative arguments raised in Count Two.

### IV.    FINDINGS ON DAMAGES

During trial, Kanawha-Gauley informed the court that it was no longer pursuing its "missing coal" or "lost coal" claims or seeking damages thereunder. (Trial Tr. p. 7.) Accordingly, Kanawha-Gauley is seeking the following categories of damages: (1) unpaid royalties; (2) interest and late fees on unpaid royalties; (3) interest and fees on late royalty payments; (4) unpaid real estate taxes plus interest; and (5) attorneys' fees incurred in pursuing this action. As an evidentiary matter, Pittston

-29-

objected during trial to the admission of Plaintiff's Exhibit 15, which provided a series of charts detailing Kanawha-Gauley's alleged damages. The court has not relied on this Exhibit, which is simply a summary, but rather has independently calculated the damages in each category based on other evidence in the record.

### A. Past Due Royalty Payments, Interest, and Fees

#### 1. Late and Unpaid Royalty Payments

As of September 25, 2009, when Kanawha-Gauley filed the instant suit, Kanawha-Gauley was owed $1,047,194.42 in past due payments. The court **FINDS** that Kanawha-Gauley has provided royalty statements in support of these damages and thus has established these damages beyond a preponderance of the evidence. Pittston has not offered any evidence or argument with respect to these damages. Accordingly, the court hereby **AWARDS** damages to the plaintiff in the amount of **$1,047,194.42** for unpaid royalty payments.

#### 2. Interest on Late and Unpaid Royalty Payments

Kanawha-Gauley also seeks to recover interest on the unpaid royalty amounts and on the late payments made for the production months of November 2008 and December 2009. The court **FINDS** that plaintiff has established that, pursuant to the Lease, it is entitled to interest at a rate of 5.25% per annum on the late payments, running from the date that each payment was due. (Pl.'s Ex. 1, at 13.) Pittston has not disputed either that Kanawha-Gauley is entitled to interest under the Lease or that the appropriate interest rate is 5.25%. Accordingly, the court hereby **AWARDS** damages to the plaintiff for interest on the late payments and unpaid payments, as calculated below.

First, with respect to liquidated damages for interest on the late payments in 2009, the court **FINDS** that the plaintiff is entitled to recover **$2,166.11**. Second, pursuant to my earlier findings

of fact, interest on the unpaid payments is to be calculated at a rate of 5.25%, running from the payment's due date until the entry of this judgment. *See Drovers Bank of Chicago v. Nat'l Bank and Trust Co. Of Chariton*, 829 F.2d 20, 22-23 (8th Cir. 1987). These interest damages are calculated as follows: (1) interest on the $571,274.84 unpaid balance for the production month of December 2008, accrued over 907 days from the due date of January 25, 2009 in the amount of $82.17 a day for a total of **$74,528.19**; (2) interest on the $179,922.01 unpaid balance for the production month of January 2009, accrued over 876 days from the due date of February 25, 2009 in the amount of $25.88 per day for a total of **$22,670.88**; (3) interest on the $91,840.54 unpaid balance for the production month of February 2009, accrued over 848 days from due date of March 25, 2009 in the amount of $13.21 per day for a total of **$11,202.08**; (4) interest on the $113,680.78 unpaid balance for the production month of March 2009, accrued over 817 days from the due date of April 25, 2009 in the amount of $16.35 per day for a total of **$13,357.95**; (5) interest on the $71,052.00 unpaid balance for the production month of April 2009, accrued for 787 days from the due date of May 25, 2009 in the amount of $10.22 per day for a total of **$8,043.14**; (6) interest on the $19,182.18 unpaid balance for the production month of May 2009, accrued for 756 days from the due date of June 25, 2009 in the amount of $2.76 per day for a total of **$2,086.56**; and (7) interest on the $242.07 unpaid balance for the partial production month of June 2009 (until June 19, 2009), accrued over 726 days from the due date of July 25, 2009 in the amount of $0.035 a day for a total of **$25.41**. The court **FINDS** that the interest on unpaid royalties totals **$131,914.21**. Accordingly, the court hereby **AWARDS** Kanawha-Gauley **$134,080.32** in damages for unpaid interest on late and unpaid royalties.

### 3.    Late Payment Penalty Charges

-31-

Second, Kanawha-Gauley also seeks to recover late payment penalties pursuant to the fourth amendment to the Lease.  Pittston asserts that it is not required to pay these penalties because Pittston was not a party to the fourth amendment to the Lease.  (Trial Tr. p. 67.)  Although Pittston was not a party to the fourth amendment, in its Agreement with Kanawha-Gauley, Pittston "agreed that it "consents in advance to any modification of this lease and that its liability shall be deemed modified in accordance with any such modification."  (Pl.'s Ex. 1, at 46.)  Pittston also explicitly agreed that its consent was not required to "make any such agreement, modification or supplements [to the Lease] effective."  (Id.)  Accordingly, the court **CONCLUDES** that Pittston's liability was modified by the fourth amendment to the Lease even though Pittston was not a signatory party to that amendment.  With respect to late payment penalty charges, the fourth amendment provides as follows:

> Any payment required to be paid to the Lessor hereunder that is not paid on or before its due date as herein specified shall, in addition to interest thereon, bear a penalty charge of Two Hundred Dollars ($200.00).  Notwithstanding the foregoing, Lessee shall NOT be required to pay more than Five Hundred Dollars ($500.00) in penalty charges in any given month or portion of a month.

(Pl's Ex. 1, at 71.)  Kanawha-Gauley seeks to recover late payment penalties for each and every month in which royalties were late or unpaid, beginning with January 2008.  The court **CONCLUDES** that Kanawha-Gauley has failed to establish that it is entitled to late payment penalties for the months of January 2008 through November 2008.  The court further **CONCLUDES** that Kanawha-Gauley has established that it is entitled to damages for late payments for the remaining months beginning with December 2008 and accumulating until the entry of this judgment.  Accordingly, the court hereby **AWARDS** damages to the plaintiff for late payment penalties

-32-

pursuant to the terms set forth in the fourth amendment to the Lease, in the amount of $500 per month, over a period of 31 months, for a total of **$15,500**.

B.      **Taxes**

Article IV of the Lease provides that the lessee shall "promptly pay when and as the same become due and payable all valid taxes."  (Pl.'s Ex. 1, at 14.)  Accordingly, KDC was not obligated to make any payments under this article of the Lease until and unless the relevant taxes were due to the appropriate local, state, or federal entity.  The court **FINDS** that Kanawha-Gauley terminated the Lease on June 19, 2009, and, therefore, KDC would only have been responsible for taxes due and payable before June 19, 2009.  Pittston, as KDC's surety, is only liable for unpaid taxes to that same extent.  When a party actually *paid* the taxes is irrelevant; the sole inquiry is when the taxes were *due.*  The notice that Kanawha-Gauley sent demanding that KDC cure the tax defaults stated that the taxes for the 2008 year were due on a bi annual basis, with taxes for the first half of a year due on September 1 and taxes for the second half of the year due on February 1 of the following year. (Def.'s Ex. 10.)  As Kanawha-Gauley has not provided any evidence to contradict or augment the schedule set forth in this notice, the court **FINDS** that this is the general payment schedule for the tax payments required under the lease.

In its Proposed Findings, Kanawha-Gauley indicates that it paid all of the taxes due under the lease for 2008 on July 30, 2008, however the tax receipts provided as Plaintiff's Exhibit 14[17] indicate that these taxes were actually paid on July 24, 2009.  (Pl.'s Ex. 14.)  According to these

---

[17] At trial, counsel for the defendant stated that he "had questions" as to the admissibility of Plaintiff's Exhibit 14. (Trial Tr. p. 60.)  The first "question" was whether these tax receipts were for the leased property.  The court hereby **FINDS** that Mr. Bozorth's testimony establishes that these tax receipts were for the leased property.  (Trial Tr. p. 61.)  The second "question" is no longer relevant because it dealt with 2009 taxes, which the court has held are not recoverable.

receipts, these taxes for the year 2008 totaled $212,889.89.[18]  (Id.)  Kanawha-Gauley is not entitled

to recover damages for any taxes incurred in 2009 because those taxes were not "due and payable"

during the term of the lease.  In addition, Kanawha-Gauley has not cited to any provision in the

Lease or otherwise established that it is entitled to assess interest on the unpaid taxes.[19]  Accordingly,

the court **AWARDS** damages to the plaintiff in the amount of **$212,889.89** for unpaid taxes.

### C.    Attorneys' Fees

Finally, Kanawha-Gauley also seeks to recover the attorney fees that it incurred in pursuing

Pittston's obligations under the contract, including the costs of this litigation.  Kanawha-Gauley

asserts that it is entitled to attorneys' fees and costs under the language in the agreement wherein

Pittston agreed to "hold lessor [Kanawha-Gauley] harmless from any cost, charge, expense, or loss

due to default under this lease by Kanawha Development Corporation."  (Pl.'s Ex. 1, at 46.)  Pittston

disputes that Kanawha-Gauley is entitled to attorneys' fees under the agreement.

West Virginia recognizes the "general rule [that] each litigant bears his or her own attorney's

fees absent a contrary rule of court or express statutory or contractual authority for reimbursement."

*Sally-Mike Prop. v. Yokum*, 365 S.E.2d 246, 248 (W. Va. 1986).  In *Harris v. Allstate Ins. Co.*, 540

S.E.2d 576 (W. Va. 2000), the Supreme Court of Appeals of West Virginia ruled that an

indemnification language in the agreement between the parties "*unambiguously* provide[d] for the

---

[18] This figure represents the total amount paid on the outstanding tax liability and includes interest assessed by the Fayette County Tax Office for late payments.  (Pl.'s Ex. 14.)

[19] Kanawha-Gauley requests interest on the unpaid taxes at a rate of 5.25% without citing to any specific provision in the lease allowing for this interest.  To the extent that Kanawha-Gauley is relying on Article III of the lease, which provides for interest on unpaid royalty payments, Article III only assesses interest on payments "not promptly made by Lessee *to* the Lessor."  (Pl.'s Ex. 1, at 13.)  Pursuant to Article IV of the lease, KDC was to pay the taxes to the appropriate collecting entity, *not* to the Lessor Kanawha-Gauley.  (Id. at 14.)

recovery of attorney fees and costs associated with the underlying action." *Id.* at 579 (emphasis in original). In *Harris*, the indemnity language provided, in relevant part:

> In the event that [VWA] or [Allstate] is party to or defendant in any litigation, claim, or other action resulting from [VWA's] efforts to recover [Allstate's] claims, [VWA] agrees to defend, indemnify and hold [Allstate] harmless from and against any and all judgments, awards, liabilities, settlements, or other costs arising from such litigation, claim, or other action.

*Id.* n. 12. The indemnity language it issue specifically provided for the payment of fees and costs associated with claims and litigation. The language in the present case is not nearly so explicit. The provision cited by Kanawha-Gauley not only fails to make any mention of claims or litigation, but it also ties the losses to a *default* by the lessor KDC, rather than Pittston's failure to perform under its surety agreement. Although KDC's default under the lease is a "but-for" cause of Kanawha-Gauley's legal fees, I **CONCLUDE** that the agreement between Kanawha-Gauley and Pittston does not unambiguously provide for the recovery of attorney fees and costs. Accordingly, I **CONCLUDE** that Kanawha-Gauley has not established that it is entitled to recover damages for its costs incurred in pursuing this action, including attorneys' fees.

## V.    JUDGMENT

For the foregoing reasons, the court hereby **ORDERS** that **judgment be entered** in favor of the plaintiff, Kanawha-Gauley Coal & Coke Company, against the defendant, Pittston Minerals Group, Incorporated. The court further **ORDERS** that the plaintiff is **AWARDED** judgment in the following amount:  (1) **$1,047,194.42** for unpaid royalty payments; (2) **$134,080.32** for unpaid interest on late and unpaid royalties; (3) **$15,500** for late payment penalties; (4) **$212,889.89** for unpaid taxes, for a **total judgment of $1,409,664.63**.

-35-

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        July 22, 2011

Joseph R. Goodwin, Chief Judge

-36-